JOEL LEVINE, State Bar No. 52565
JOEL LEVINE, A PROFESSIONAL CORPORATION
695 Town Center Drive, Suite 875
Costa Mesa, California 92626
Telephone: 714 662 4462
Facsimile: 714 979 9047
Email:     jlesquire@cox.net

PAUL S. MEYER, State Bar No. 511146
PAUL S. MEYER, A PROFESSIONAL CORPORATION
695 Town Center Drive, Suite 875
Costa Mesa, California 92626
Telephone: 714 754 6500
Facsimile: 714 979 9047
Email:     pmeyer@meyerlawoc.com

Attorneys for Defendant RONALD RODIS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. SA-CR-13-208-DOC |
|---|---|
| Plaintiff, | |
| vs. | DEFENDANT RONALD RODIS' SENTENCING MEMORANDUM |
| RONALD RODIS, | Hearing Date: May 1, 2017<br>Hearing Time: 1:30 p.m.<br>Location: Courtroom of The Hon. David O. Carter |
| Defendant. | |

1

I.   **INTRODUCTION AND STATEMENT OF FACTS**

Defendant Ronald Rodis, a former attorney who has voluntarily resigned from the California State Bar, has pleaded guilty to conspiracy to commit wire fraud. The charges emanate from a six-month period in 2008-2009 in which Rodis was placed by his co-defendants as the titular head of Rodis Law Group, a law firm servicing clients needing loan modifications to avoid foreclosure on their homes during the mortgage crisis of that period.

As set forth in more detail in the Plea Agreement (pp 10-11), the Presentence Report (pp 6-7) and the letter of the Probation Officer to the Court, Rodis' participation in these events was to lend his name and profession to the operation, and to read a broadcast radio advertisement which exaggerated the abilities of the business to service the clients. Others in the business, namely his co-defendants, made many direct misrepresentations to the clients and potential clients. Moreover, in its Reply Memorandum to the D'Antonio Sentencing Memorandum, the government has acknowledged that D'Antonio "created" and "orchestrated" these businesses. Rodis' participation level during these activities was limited to the actual servicing of the clients' legal needs. As further evidence of his efforts in this regard, we attach hereto, as Exhibits A, a number of letters of employees of the business attesting to his efforts. Indeed, in one of these letters, from Robert Hart, other participants directed that the details of the sales activities be kept from Mr. Rodis (see Exhibit A, page 3).

At the sentencing hearing of Mr. D'Antonio, the Court posed questions regarding whether clients were ever serviced in this business, and also why the case has taken so long to reach its conclusion. With respect to the first question, attached hereto as Exhibit C is a flow chart which was prepared during the FTC litigation which illustrates the efforts and results by the service components of these businesses. Although the chart does show some performance deficiencies, it also shows efforts to service clients, and results, which efforts were made by Mr. Rodis and the people

that he supervised. With respect to the delays in bringing this case to its conclusion, these delays are attributable in large part to the over 360 bankers boxes of client files which were part of the discovery materials. These files show extensive efforts that were expended by Mr. Rodis and the department that he supervised.

The driving force behind this business was Bryan D'Antonio. Unbeknownst to Mr. Rodis and many others who worked at Rodis Law Group, Mr. D'Antonio had been the subject of a prior injunctive action and criminal case which together prohibited his participation in this business or any other like it. Less than six months into his involvement in the business, Mr. Rodis began to learn more about Mr. D'Antonio. Within that same time frame, Mr. Rodis became aware that he was not going to be provided with the resources to service the clients. As a result, Mr. Rodis took on no further new clients, remained only to service those who had previously asked for service, and then he resigned. Following this, Mr. D'Antonio set up another law firm, America Law Group, to perform the same services with another attorney (who has *not* been prosecuted) as its titular head.

This factual backdrop provides some of the reasons for the within request for a sentence well below the guideline range, some of which is actually supported by the Probation Office and/or the United States Attorney. Most of the arguments being advanced herein are couched in the principles of 18 U.S.C. Section 3553, <u>United States v. Booker</u>, 543 U.S. 220 (2005) and its progeny, which are more elaborately set forth in Part III of this Memorandum.

## II. THE PROBATION REPORT

The Guideline range referred to in the Probation Report (level 26) comports with the range agreed to in the Plea Agreement. We are therefore bound by contract to those calculations as the starting point in the Court's ultimate decision. We note, parenthetically, that even that Guideline calculation (63-78 months) is not the actual recommendation of the Probation Officer (48 months).

We also note that Guideline calculation formulas for "loss" have been recently affected by changes in the Guideline Manual. Application Note 3(A)(ii) to Section 2B1.1 had now been changed to define "intended loss" to mean "the pecuniary harm that the defendant purposely sought to inflict" on his or her victims. Although the place to factor in this change may, because of the Plea Agreement, be in the last section of this Memorandum (under Section 3553), it does reflect a growing understanding by the Sentencing Commission that gross dollars as loss can be very misleading, especially when evaluating the conduct of a defendant, such as Mr. Rodis, who for the most part tried to do the right thing and provide the firm's clients with services.

### III.   BOOKER AND ITS PROGENY

In <u>United States v. Booker</u>, the United States Supreme Court held that the mandatory sentencing guidelines scheme, used by the federal courts for almost 20 years, was unconstitutional. 543 U.S. 220, 125 S. Ct. 738 (2005). Under the remedy portion of the unique two-part <u>Booker</u> opinion, the sentencing guidelines are now "advisory," and while sentencing courts must continue to consider the now-advisory guidelines in sentencing, courts must sentence in light of <u>all</u> of the sentencing concerns enumerated in 18 U.S.C. § 3553(a). Thus, the Court held that the sentencing court should "consider guidelines ranges . . . but it permits the court to tailor the sentence in light of other statutory concerns as well." <u>Id</u>. at 245. The guidelines are now just one factor of many to consider in fashioning an appropriate sentence that furthers the objectives of 18 U.S.C. § 3553(a). <u>United States v. Ameline</u>, 400 F.3d 646, 655-56 (9th Cir. 2005).

Sentencing is to be based on the factors enumerated in 18 U.S.C. § 3553(a), with the overriding concern that "[t]he court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes of [sentencing]." 18 U.S.C. § 3553(a). "Accordingly, in addition to the advisory guideline range, a sentencing

court must consider 'the nature and circumstances of the offense and the history and characteristics of the defendant' as well as the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with needed training and medical care. In addition, the court must consider the relevant Sentencing Commission policy statements and the need to avoid unwarranted sentencing disparities and to provide restitution to victims." Ameline, 400 F.3d at 656.

The first subpart of 18 U.S.C. Section 3553(a) focuses on the nature of the offense and the characteristics of the defendant. It is these factors which compel the reduced sentence sought herein.

We first address realistically Mr. Rodis' involvement in this conspiracy, especially when compared to the others involved. At first blush, because his name was on the title of the business, one could conclude (though erroneously) that his involvement was pronounced. True, the name of a licensed attorney on the letterhead was a necessary component of the operation, and an attorney was needed for the legitimate servicing of the clients' cases. It is also true that Mr. Rodis helped broadcast misleading radio advertisements.

However, while others in the scheme were more directly and pervasively making misrepresentations to clients, Rodis was spending his time working on behalf of the clients, tirelessly attempting to obtain mortgage default relief for them. Mr. Rodis, unlike the other participants, was not involved and was excluded in the intake portion of the business where clients were verbally solicited. The number of clients solicited by the others grew at such a rapid pace that, despite his efforts, he could not keep up with the needs of the clients. He was additionally promised that other attorneys would be added so that these clients could be serviced. The letters of the employees that are attached to this Memorandum establish these efforts and that Mr. Rodis' "heart" was in the right place. This does not excuse his conduct, but places

it in an enlightened context.

For example, Jennifer Lee, another attorney on the staff of Rodis Law Group for a short time, describes Mr. Rodis as diligently working on the cases of clients, instituting refunds when he could not perform the work. Robert Hart, an intake officer, describes the efforts by the intake department to exclude Mr. Rodis from their activities, which resulted in Mr. Rodis departing the firm. Barbett Carr, a legal services employee, portrays Mr. Rodis as diligently training other staff members when he could, but also relates statements by the wife of Mr. D'Antonio that Mr. Rodis is only a contracted attorney, not the firm's owner, and that decisions are not made by Mr. Rodis. Similarly, Raul Carranza, another legal services employee, describes Mr. Rodis as "a man of value, ethics, character, scruples" and high moral fiber. Similar accolades of other staff members are also attached.

The others involved in these charges, especially Mr. D'Antonio, who ran virtually the entire promotion effort, are quite different. Those people had direct contact with potential clients and solicited them with numerous misrepresentations. The only person somewhat similarly situated to Mr. Rodis was the attorney who was the nominal head of American Law Group, a firm set up by Mr. D'Antonio after Mr. Rodis withdrew. That firm began servicing the clients after April 2009. Its "owner," also an attorney, was never criminally charged.

With respect to Mr. Rodis, his involvement in this business resulted in the loss of his profession as he resigned from the State Bar with charges pending. It also cost him his marriage as his wife filed for divorce as these events unraveled and as Mr. Rodis became involved in litigation with the FTC.

His health has also deteriorated since these events. Although a young man at age 52, he has been in abnormally ill health. As reflected in Exhibit B, a series of medical reports and letters, he has experienced four spinal surgeries since he left the business and is still recovering from the last one. The permanent pain from these procedures has resulted in his dependency on pain medication, which is reflected in

6

1 paragraph 66 of the PreSentence Report. Recently, this Court signed an Order
2 permitting Mr. Rodis, through PreTrial Services, to obtain counseling for this
3 dependency. We not only hope that the Court will factor this history in the
4 computation of a just sentence, but will also consider a recommendation for the
5 RDAP Program in the event the sentence includes incarceration.

6     We also ask the Court to consider Mr. Rodis' valuable cooperation in this case,
7 which we believe will be described in some detail in a recommendation pleading to
8 be submitted by the prosecution. Although we will address the quantity of any such
9 reduction more completely when Mr. Rodis is sentenced, suffice to say for the
10 moment that his cooperation preceded the other defendants and that his cooperation
11 played a key role in the decision of the co-defendants to plead guilty.

12     Lastly, we attach hereto as Exhibit D a letter from Mr. Rodis highlighting some
13 of the things referred to above, and his sincere remorse for his causing his part of the
14 harm in this case, both to himself and others. We also attach as Exhibit E numerous
15 letters of third parties attesting to the good character of Mr. Rodis so that the Court
16 will see that he is a person of substantial worth. These letters reflect, *inter alia*, his
17 devotion to his children, his extended family, and friends. He is consistently
18 described as a person as a person of high moral fiber deserving of consideration as
19 such by this Court.
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 //

## IV. CONCLUSION

Ronald Rodis has admitted his wrongdoing to the Court, which was significantly less substantial than others in this case. Yet, he has paid a higher price than anyone else involved to date. We respectfully urge the Court to factor these thoughts in arriving at a just sentence.

Respectfully submitted,

Dated: April 14, 2017

JOEL LEVINE
A PROFESSIONAL CORPORATION

s/
JOEL LEVINE
Attorney for Defendant
RONALD RODIS

Dated: April 14, 2017

PAUL S. MEYER
A PROFESSIONAL CORPORATION

s/
PAUL S. MEYER
Attorney for Defendant
RONALD RODIS

DEFENDANT RONALD RODIS' SENTENCING MEMORANDUM