SANDRA R. BROWN
Acting United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
JOSEPH T. MCNALLY (Cal. Bar No. 250289)
Assistant United States Attorney
Deputy Chief, Santa Ana Branch Office

MICHAEL S. BLUME
Director, Consumer Protection Branch
United States Department of Justice
JOHN W. BURKE
Trial Attorney, Consumer Protection Branch
United States Department of Justice

    United States Courthouse
    411 West Fourth Street
    Santa Ana, California 92701
    Telephone: (714) 338-3500
    Facsimile: (714) 338-3561
    E-mail:    joseph.mcnally@usdoj.gov
               josh.burke@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>           v.<br><br>RONALD RODIS,<br><br>       Defendant. | No. SA CR 13-208-DOC<br><br>GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT RONALD RODIS<br><br><br>Sentencing Date: May 1, 2017<br>Time: 1:30 p.m. |

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.    INTRODUCTION AND FACTUAL BACKGROUND

     Defendant is before the Court for sentencing having pleaded guilty to conspiracy to commit wire fraud.  From October 2008 through June 2009, at the height of the housing crisis, defendant joined a conspiracy to take upfront fees from over 1,500 victims for loan modification and foreclosure rescue services.  Defendant used his name and law license to lend legitimacy to the scheme.  The scheme began with a series of brazen misrepresentations by defendant Rodis designed to induce struggling homeowners to call Rodis Law Group.  In one of the ads, attached as Exhibit A, an announcer says, "Attention, homeowners.  You're in over your head, behind on your mortgage, unable to refinance, even facing foreclosure.  What happens next?"  Defendant Rodis then states:

          Hi, I'm Ron Rodis with the Rodis Law Group.
          Don't let foreclosure push you out of your home.
          My staff of real estate attorneys will fight for
          you.  I have been protecting homeowners like you
          since 1996, and my team of experienced attorneys
          are highly skilled in negotiating lower interest
          rates and even lowering your principal balance.
          Yes, I said even lowering the principal balance.

The perception created by the radio ads – which were broadcast nationwide from the very beginning of the scheme – was in stark contrast to the reality of Rodis Law Group.  In reality, Rodis Law Group was a telemarketing boiler room, in which telemarketers vastly outnumbered employees in the back room working on files.  These telemarketers answered to Rodis's co-defendants, Bryan D'Antonio and Charles Wayne Farris, but they reinforced the false impression

created by the involvement of an attorney and the radio ads Rodis recorded.  The telemarketers falsely claimed to struggling homeowners that they were contacting a successful, established law firm comprised of a team of attorneys that would save the victims' homes from foreclosure in exchange for a fee ranging from $3,500 to $5,500.  To induce the victims, the telemarketers boasted that the law firm routinely obtained loan modifications and reductions in the principal balance, and had a 100% success rate.  More than 1,500 victims lost over $6,000,000 as a result of defendant's conduct at RLG.

Despite the statements in the radio ads and the representations of the telemarketers, Rodis and the others working on files achieved very few results for the victims.  The court-appointed receiver that took over the RLG/ALG business in May 2009 calculated that the companies' efforts "resulted in only eight loan modifications completed and accepted by the consumer, representing about **.37% (3/8ths of one percent)** of the total clients." See Receiver's Report, attached as Exhibit B, at p.4 (emphasis in original).  The Receiver found that 99% of the clients did not receive any of the promised benefits of hiring RLG.  Id.  The letters from victims, attached as Exhibit C, show the effects of RLG's lies on struggling homeowners throughout the country.

The United States has no objection to the facts and calculations in the presentence report.  As described in a supplemental sentencing position filed under seal today, the United States requests an additional departure, resulting in a sentencing

2

1  range of 46-57 months' in prison, followed by three years'
2  supervised release, and full restitution to the victims.

3  II.  THE GOVERNMENT HAS NO OBJECTIONS TO THE PRE-SENTENCE REPORT

4       On January 17, 2017, the United States Probation Office
5  ("USPO") disclosed to the parties its Presentence Report ("PSR") in
6  this matter.  The USPO found that defendant was subject to the
7  following Sentencing Guidelines calculations:

8       Base offense level:     7 (U.S.S.G. § 2B1.1(b)(1))
9       Loss Amount:            18 (U.S.S.G. § 2B1.1(b)(1)(J))
10      Victims:                2 (U.S.S.G. § 2B1.1(b)(2)(A))
11      Position of Trust:      2 (U.S.S.G. § 3B1.3)
12      Acceptance:             -3 (U.S.S.G. § 3E1.1(a))
13      Total Offense Level:    26
14  PSR ¶¶ 25-40.

15      Based on an offense level of 26, the USPO found that
16  defendant's sentencing range on count one is 63-78 months'
17  imprisonment.  See PSR ¶ 87.  As discussed in the United States'
18  supplemental sentencing position filed under seal today, the United
19  States is seeking an additional departure from the sentencing range
20  calculated in the PSR.

21  III. THE COURT SHOULD SENTENCE DEFENDANT TO 46 MONTHS' IMPRISONMENT

22      In addition to considering the Sentencing Guidelines range, the
23  Court must consider the section 3553(a) factors including
24  defendant's history; the nature and seriousness of the offense; the
25  need to deter defendant and others; and the need to protect the
26  public.  These factors support the recommended sentence.  Defendant

27

28
                                    3

used his name and his law license to lend legitimacy to a fake law firm promising to help struggling homeowners with their mortgage and foreclosure problems.  Defendant was not an unwitting participant in the fraud.  He recorded blatantly false radio advertisements touting the proven track record and results of his nonexistent "team of experienced attorneys."  He made specific false promises of results, including "lowering the principal balance."  As thousands of desperate homeowners called in response to the promises in the radio ads, defendant Rodis did nothing to correct the lies and misrepresentations in the ads.  The 1,500 plus victims of Rodis Law Group – many of whom were struggling economically during the financial crisis - sustained losses totaling over $6,000,000.  The recommended sentence is necessary and sufficient to deter defendant and others from engaging in this type of criminal conduct.

Plaintiff, by and through its attorney of record, the United States Attorney for the Central District of California, hereby files its position regarding the Presentence Report ("PSR") submitted by the United States Probation Office for defendant RONALD RODIS.

The government's sentencing position is based on the attached memorandum of points and authorities, the PSR, the records and files of this case, and any argument that the Court may request at the sentencing hearing.  The government respectfully requests the opportunity to supplement its position as may become necessary.


Dated: April 24, 2017          Respectfully Submitted,



_____/s/_____
JOSEPH MCNALLY
Assistant United States Attorney
United States Attorney's Office


_____/s/_____
JOHN W. BURKE
Trial Attorney
Consumer Protection Branch
United States Department of Justice

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

ORIGINAL

# OFFICIAL TRANSCRIPT PROCEEDING

# FEDERAL TRADE COMMISSION

MATTER NO.    X000001

TITLE         MEDCO/DATA MEDICAL CAPITAL

DATE          RECORDED: DATE UNKNOWN
              TRANSCRIBED: MARCH 9, 2009

PAGES         1 THROUGH 4

### RODIS LAW GROUP ADVERTISEMENT

FOR THE RECORD, INC.
10760 DEMARR ROAD
WHITE PLAINS, MARYLAND 20695
(301)870-8025

**EXHIBIT A**

1

```
 1              FEDERAL TRADE COMMISSION

 2                   I N D E X

 3

 4   RECORDING:                                    PAGE:

 5   Rodis Law Group Advertisement                   3

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXHIBIT A**

2

1                          FEDERAL TRADE COMMISSION

2

3        In the Matter of:                )

4        Medco/Data Medical Capital      )   Matter No. X000001

5                                          )

6        ------------------------------)

7                                          Date Unknown

8

9

10

11             The following transcript was produced from a

12       digital recording provided to For The Record, Inc. on

13       March 3, 2009.

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT A**

3

1                          P R O C E E D I N G S

2                          -     -     -     -     -

3              MALE ANNOUNCER:  Attention, homeowners.  You're

4      in over your head, behind on your mortgage, unable to

5      refinance, even facing foreclosure.  What happens next?

6              RON RODIS:  Hi, I'm Ron Rodis with the Rodis

7      Law Group.  Don't let foreclosure push you out of your

8      home.  My staff of real estate attorneys will fight for

9      you.  I have been protecting homeowners like you since

10     1996, and my team of experienced attorneys are highly

11     skilled in negotiating lower interest rates and even

12     lowering your principal balance.  Yes, I said even

13     lowering the principal balance on your mortgage.

14             MALE ANNOUNCER:  If you want to keep your home,

15     you need to put the power of Rodis Law Group on your

16     side.  Call now for your free consultation and don't

17     forget to ask for your free booklet, The Seven Things The

18     Banks Don't Want Homeowners To Know.  Call now at 877-

19     222-0058.  That's 877-222-0058.

20             Call Rodis Law Group now for your loan

21     modification at 877-222-0058.  That's 877-222-0058.

22             **(The recording was concluded.)**

23

24

25

**EXHIBIT A**

4

1            C E R T I F I C A T I O N    O F    T Y P I S T

2

3      MATTER NUMBER: X000001

4      CASE TITLE: MEDCO/DATA MEDICAL CAPITAL

5      TAPING DATE: DATE UNKNOWN

6      TRANSCRIPTION DATE:  MARCH 9, 2009

7

8           I HEREBY CERTIFY that the transcript contained

9      herein is a full and accurate transcript of the tapes

10     transcribed by me on the above cause before the FEDERAL

11     TRADE COMMISSION to the best of my knowledge and belief.

12

13                         DATED:  MARCH 9, 2009

14

15

16                         ELIZABETH M. FARRELL

17

18          C E R T I F I C A T I O N    O F    P R O O F R E A D E R

19

20           I HEREBY CERTIFY that I proofread the transcript for

21     accuracy in spelling, hyphenation, punctuation and

22     format.

23

24

25                         WANDA J. RAVER

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**EXHIBIT A**

1   GARY OWEN CARIS (SBN 088918)
    gcaris@mckennalong.com
2   LESLEY ANNE HAWES (SBN 117101)
    lhawes@mckennalong.com
3   McKENNA LONG & ALDRIDGE LLP
    444 South Flower Street, 8th Floor
4   Los Angeles, CA 90071-2901
    Telephone: (213) 688-1000
5   Facsimile: (213) 243-6330

6   Attorneys for Temporary Receiver
    ROBB EVANS & ASSOCIATES LLC
7

8               UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                    SOUTHERN DIVISION

11

12  FEDERAL TRADE COMMISSION,          Case No. 8:99-cv-01266 AHS (EEx)

13                  Plaintiff,          **REPORT OF TEMPORARY
                                        RECEIVER'S ACTIVITIES FOR
14          v.                          THE PERIOD OF MAY 27, 2009
                                        THROUGH JUNE 12, 2009**
15  DATA MEDICAL CAPITAL, INC.,
16  et al.,

17                  Defendants.

18

19

20

21

22

23

24

25

26

27

28

McKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
LOS ANGELES

**EXHIBIT B**

1     TO THE HONORABLE ALICEMARIE H. STOTLER, UNITED STATES

2  DISTRICT JUDGE:

3     Robb Evans & Associates LLC as Temporary Receiver of Data Medical

4  Capital, Inc. and other related entities files herewith its Report of Temporary

5  Receiver's Activities covering the period from the inception of its appointment on

6  May 27, 2009 through June 12, 2009.

7

8  Dated:    June 16, 2009        McKENNA LONG & ALDRIDGE LLP
                                 GARY OWEN CARIS

9                                  LESLEY ANNE HAWES

10

11                               By: /s/ *Gary Owen Caris*

12                                   Gary Owen Caris
                                   Attorneys for Temporary Receiver

13                                   ROBB EVANS & ASSOCIATES
                                   LLC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPORT OF TEMPORARY RECEIVER'S ACTIVITIES FOR THE PERIOD OF 5/27/2009 - 6/12/2009
LA:17658077.1

**EXHIBIT B**

# ROBB EVANS & ASSOCIATES LLC
### Temporary Receiver of
### The Rodis Law Group, Inc.
### America's Law Group
### The Financial Group, Inc. dba Tax Relief ASAP

### REPORT OF TEMPORARY RECEIVER'S ACTIVITIES
### MAY 27, 2009 THROUGH JUNE 12, 2009

This report covers the activities of the Temporary Receiver[1] since the inception of the temporary receivership. This is the first Report to the Court on the progress of the temporary receivership. It does not constitute an audit of financial condition and is intended only to provide information for use by the Court in assessing the progress of the Receivership.

## Custody, Control and Possession

The Temporary Receiver arrived at the premises at approximately 10:00 a.m. on Thursday, May 28, 2009. The offices are located on the second and third floors of a high rise office building located at 1100 Town and Country Road, Orange, California. The Temporary Receiver met with the individual defendant, Bryan D'Antonio (D'Antonio), and served him with a copy of the Temporary Restraining Order With Asset Freeze, and began to discuss the operations of the business. Shortly after starting this interview, D'Antonio advised the Temporary Receiver that he wanted to talk with his counsel before answering any other questions. The Temporary Receiver terminated the interview.

The Temporary Receiver interviewed other key employees, including Ron Rodis and Nicholas Chavarela, the lawyers who purportedly own the Rodis Law Group, Inc. (RLG) and America's Law Group (ALG), respectively. The Temporary Receiver also interviewed other senior staff members, supervisors, and many of the employees. Other employees were asked to fill out a questionnaire and permitted to leave for the day.

The Temporary Receiver maintained a group of selected staff for the purpose of postponing foreclosure sale dates between May 27, 2009 and the scheduled Preliminary Injunction hearing on June 29, 2009. The staff was able to postpone many, but not all, sale dates. The Temporary Receiver also maintained a small group of selected staff assigned to The Financial Group (TFG) to respond to prior commitments or conference dates with the Internal Revenue Service or the California Franchise Tax Board in an effort to postpone or eliminate threatened levies on bank accounts, real property, and wages.

---

[1] Reference to the Temporary Receiver in this report means the Temporary Receiver, the Temporary Receiver's Deputies, its staff, and its counsel.

**EXHIBIT B**

On June 8, 2009 the Temporary Receiver determined the RLG operations, the ALG operations, and TFG operations could not continue because none of the entities could be operated lawfully and profitably, or could provide the services promised in advertising and personal solicitations. As described in detail in this report, the Temporary Receiver determined the advertising and sales scripts used by the entities to lure consumers were misleading and untruthful. The Temporary Receiver determined that it could not authorize the continued use of the advertisements and sales scripts, or spend the funds on employee efforts, which would not be able to produce the results promised to consumers.

## Receivership Defendants and Affiliated Entities

The Temporary Receiver confirmed that the three receivership defendants, RLG, ALG, and TFG, were conducting business in separate sections of the two occupied floors. TFG was in the process of relocating certain departments to the second floor. Tax Relief ASAP, a registered fictitious business name of TFG, was located on the second floor, along with some accounting personnel and D'Antonio's office. Most of the employees worked on the third floor.

The Temporary Receiver located corporate documents on twelve different corporate entities, a portion of which appear to be affiliated entities. The Temporary Receiver is continuing to investigate the nature of the business relationship between the entities and the Receivership Defendants.

It appears that Christi D'Antonio is the sole officer and director of nine of the 12 entities, including the Receivership Defendant, TFG. The Temporary Receiver determined that one of Christi D'Antonio's companies, Compass Inc., a new software business, was located on the premises and was prepared to begin operations within a few days.

RLG was incorporated in California on October 20, 2008. RLG has been soliciting and accepting clients for its foreclosure relief services since November, 2008. As detailed below, since November, 2008 RLG has collected about $7.3 million from 1,760 clients, although some of the fees have been refunded. The services provided and results of the operation of the foreclosure relief business are discussed in detail below. During an interview, Ron Rodis advised the Temporary Receiver that he elected to discontinue marketing and accepting any new clients as of April 14, 2009.

Nicholas Chavarela incorporated The Law Offices of Nicholas Chavarela, Inc., on April 1, 2009 and filed a fictitious business name statement on April 9, 2009 indicating he would conduct business as America's Law Group. ALG has been soliciting and accepting clients for its foreclosure relief services since April 14, 2009. As detailed below, since April 14, 2009 ALG has collected $987 thousand from 408 clients, although some of the fees have been refunded. Nicholas Chavarela, the purported owner of ALG, became an employee of RLG on April 1, 2009. However,

**EXHIBIT B**

when RLG elected to discontinue marketing and accepting clients, ALG immediately took the place of RLG in the organized marketing program to solicit and accept clients. The services provided and results of the operation of the foreclosure relief business are discussed in detail below.

TFG was incorporated in California on June 12, 2006. TFG has been soliciting and accepting customers for income tax relief services since March, 2008. As detailed below, since March 2008, TFG has collected $3.9 million from consumers, although some of the fees have been refunded.

The latest corporate entity is the National Loan Modification Association, Inc. It was incorporated on May 12, 2009 and identified D'Antonio as the initial director of the company.

## Summary of Observations and Conclusions

The following sections and the expanded details presented below describe the basis for the Temporary Receiver's conclusion that D'Antonio oversaw and controlled all of the Receivership Defendants' business operations. Based on documents reviewed and conversations with the attorneys and staff members, the Receiver has determined that defendant D'Antonio located and recruited the attorneys to be associated with his organization and set up the operational framework under which the law groups operate. TFG, controlled by D'Antonio, recruits, hires, and trains the sales personnel, titled as intake officers, who carry out the marketing program to solicit and accept customers for foreclosure relief services. His company also recruits, hires, and trains personnel for the legal support service functions associated with the foreclosure relief operation.

His company also is the tenant occupying the two floors and provides all operational and administrative support to the two law organizations. Such support includes accounting systems and reports, a database system and full IT management, the telephone system, human resource administration, and computers and office furniture. The law groups have contracts to reimburse TFG.

The Receiver has also determined that D'Antonio sets or heavily influences basic marketing and operational policies and philosophies for all the businesses, and often makes decisions about wording of the scripts, handling of consumer complaints, and decisions about consumer refunds.

The experience, training, and availability of experienced legal service personnel and availability and participation of attorneys do not match the advertising and claims by sales personnel in telephone calls and letters to potential customers.

While many of the employees in the legal support area were sincere and motivated, a review of personnel files revealed that a substantial number of the employees had limited education, training and experience in the consumer mortgage area. The

**EXHIBIT B**

qualifications, training, and experience of the employees in the legal support area were in sharp contrast to the representations in advertising and marketing scripts for telephone conversations, voice messages, and e-mail reminders that qualified attorneys, paralegals, and other experienced professionals actively worked on behalf of the clients.

The number of completed loan modifications and the number of loan modifications in progress, documented by company records and databases, are presented in detail below. The results are meager in contrast to the claims made in the marketing and solicitation process.

On a consolidated basis, since November 2008 the records of the law groups provided to the Temporary Receiver showed that the efforts of the law groups for the past six months have resulted in only eight loan modifications completed and accepted by the consumer, representing about **.37% (3/8ths of one per cent)** of the total clients. The records show that about 99% of the clients have not received any of the promised interest-rate reductions, a reduced level of payments, a forgiveness or postponement of delinquent current payments, or a reduction in the principal amount owing. 34% of the total clients have received some progress[2] toward a loan modification over the six-months that the company has been active, although not a completed modification.

The results discussed above, the details in the consumer complaints discussed later in this report, and the Temporary Receiver's observations from reviewing consumer files indicate the legal support staff was not able to properly address the volume of files.

## Business Operations

### Management Control and Staffing

Based on a series of interviews with midlevel and senior staff, a review of documents and electronic data, including but not limited to corporate documents, email communications and correspondence, the Temporary Receiver has concluded that D'Antonio oversaw and controlled all of the Receivership Defendants' business operations.

Midlevel and senior staff described D'Antonio as the final senior officer to resolve a problem with a client. References were also made to Christi D'Antonio and Wayne Farris as the other two people in control of management decisions.

---

[2] Comprised of 51 loan modifications approved by lenders but not completed, 211 loan modifications being reviewed by lenders, and 478 loan modifications submitted to lenders but not in review status.

**EXHIBIT B**

The Temporary Receiver reviewed numerous email communications documenting that D'Antonio was consistently advised of the status of a particular project or approached for approval of a pending action. D'Antonio was advised of refund requests and was asked directly to approve certain large refund requests (Tab 1[3]).

Under Tab 2 is an exchange of emails between D'Antonio and the Controller of RLG. The Controller reported to D'Antonio about the transfer of funds from RLG to TFG. $100,000 was transferred into a money market account for TFG and $800,000 was deposited into "the other account that we are not using, leaving about $300K in there." D'Antonio responded by thanking the Controller for her diligence and follow through. He referred to himself as a "business owner", although D'Antonio is not a shareholder of record for TFG. These transfers and D'Antonio's approval of the transfers appear to demonstrate that D'Antonio controlled the funds generated by RLG, which was presented to consumers as an independent law firm.

D'Antonio was a signatory on the bank accounts for all three of the Receivership Defendants. It is particular noteworthy that Mr. Chavarela was not even a signatory on the bank account for his law firm.

D'Antonio and Christi D'Antonio both identify themselves as President and CEO of TFG. Under Tab 3 is a series of documents signed by D'Antonio or Christi D'Antonio where they identify themselves as the President or CEO of TFG on alternating dates. For example, D'Antonio identifies himself as CEO on July 21, 2008 and on October 15, 2008. On September 17, 2008, Christi D'Antonio signed a document and identified herself as CEO of TFG.

Another event considered by the Temporary Receiver in concluding that D'Antonio controls the operations and senior management of all three Receivership Defendants occurred when D'Antonio interrupted an interview the Temporary Receiver was conducting with three senior management personnel of the Receivership Defendants. Present in the interview were Chavarela, Wayne Farris, who is referred to as Managing Director for RLG, or as a Strategic Tax Manager or as a Senior Vice President of Tax Relief ASAP, or as Senior Executive Director for ALG, and Nadir Qsar, the Director of Legal Services for RLG and ALG. D'Antonio instructed them not to talk to the Temporary Receiver without counsel and the interview was interrupted and terminated.

There seem to be four types of staff members in RLG and ALG: intake officers, intake clerks, negotiators, and case managers. They do not use the term "paralegals." Intake officers are actually members of the sales force. They communicate with and solicit the consumers who contact ALG as a result of the marketing efforts. The intake clerks accept the file from the intake officers and prepare the file before sending it on to the case managers and negotiators. If the prospective customer is

---

[3] The Temporary Receiver has redacted the consumer's name on this document and on all other documents contained in this report.

**EXHIBIT B**

determined to be a suitable candidate for the foreclosure relief services, the customer is directed to send the retainer fee and advised he will need to provide requested information to a case manager. When the financial arrangements are completed, the intake officer prepares a retainer agreement, mails it to the consumer, and waits for the document to be completed and returned. When the completed and signed retainer agreement is returned, the file is transferred to the Legal Support Division.

Case managers and negotiators work in groups of five with case managers typically being three of the five and negotiators being two of the five. Some of the senior management and team members did work for both law firms. The transition from RLG to ALG was almost seamless for the intake function, with only minor adjustments made to the scripts for telephone conversations, voicemail messages and e-mail follow-up letters. The legal support staff began transitioning to ALG customers as the volume began to increase.

All three of the Receivership Defendants shared most of the staff dedicated to accounting and information technology services.

## Lead Generation and Direct Marketing

RLG and ALG used radio advertisements and internet websites to attract clients. Although the numbers are preliminary, it appears that the Receivership Defendants spent almost $2.5 million on advertising costs from November 2008 to the present.

In April of this year, there were no additional advertisements for RLG. Concurrently with the cessation of advertisements for RLG, a new advertising campaign was initiated for ALG. Based on financial records and other documents it appears that TFG funded all of the start-up costs for ALG.

Many of the advertisements used for ALG were identical to the RLG advertisements with only the firm's name changed. Even though it appears that the transition from RLG to ALG did not commence until the middle of April 2009, accounting records of TFG show an accounts receivable from ALG of $86,740.50. The Temporary Receiver has not found any information that suggests Nicholas Chavarela invested any of his own funds in ALG. E-mail records document that TFG paid the incorporation and other organizational expenses of ALG (Tab 4).

## The Intake Process

The Temporary Receiver located Client Services Training Manuals on desks in the intake area. Some were labeled ALG and some were labeled RLG. The Temporary Receiver collected and reviewed scripts and marketing materials that are replete with misrepresentations, misleading comments, and false statements.

The intake staff was provided with scripted instructions to respond to incoming telephone calls and a script to use when sending e-mail to consumers or leaving voice

**EXHIBIT B**

messages for consumers.  Following are samples of the misrepresentations contained in these materials (See Tab 5).  Almost identical documents were found for RLG and ALG:

- After stating that the company can't give a guarantee, the script goes on to state, "Our lead attorney Ron Rodis has been doing this since 1996 and **every case** he has brought on has had principle reduction or rate reduction (emphasis added)."

- "All of our Attorney's are licensed in Federal Court, so we will be able to represent you in any State."

- "Well, we wouldn't take you on as a client if we weren't confident we can help you."

- In an e-mail from an intake officer for ALG to a potential client, ALG states, "America's Law Group has twelve years experience and a firm background of Real Estate Law, Contract Law and Real Estate Litigation from which to draw upon.  Our practice specifically focuses on "Mortgage Modifications" for our clients."

In fact, Nicholas Chavarela was admitted to practice law in California approximately 18 months ago on December 3, 2007.  Also attached in Tab 5 is an e-mail from another ALG intake officer with almost identical language.

- In another e-mail to a prospective client, an ALG intake officer stated that, "America's Law Group, Inc. is the leading law firm in the country specializing in renegotiating mortgage contracts.  Our attorneys have been involved in real estate law since 1996 and have extensive contract and litigation experience.  The Attorneys on our staff are all highly skilled in real estate law and renegotiating mortgage contracts."

- Potential clients were advised that they should deal with an attorney to represent them in loan modification.  Also included in Tab 5 is an email to a potential client about the fees charged and the length of time it typically takes to resolve a case (1-3 months), and states that "The bottom line is we routinely rewrite mortgage contracts on behalf of our clients.  The banks may not like us but our clients love us.  We typically lower interest rates, extend fixed rate terms, push any past due monies owed to the back of the loan, extend the total length of the term of the loan, and even lower principal balances on mortgages.  If the bank we are negotiating against doesn't want to do what we want to do for our client, we always offer to haul them into court and in front of a judge; do a forensic analysis of the loan documents, review the documents for RESPA violations, TILA violations, GFE violations and Predatory Lending Violations."  "There is no lender in the country that can

**EXHIBIT B**

afford for us to do that to them and they know it. Consequently, we are extremely successful for our clients." (emphasis added)

The Temporary Receiver will discuss in greater detail later in this report what could be considered a routine or typical result. However, the Temporary Receiver has not found one instance where a "forensic analysis" was conducted on a client's file. Ron Rodis stated that RLG had not conducted one forensic audit and such an audit would need to be outsourced. When asked if RLG ever outsourced a forensic audit, Mr. Rodis elected not to respond. When asked if ALG ever conducted a forensic audit, Mr. Chavarela replied that it had not and any such forensic audit would need to be outsourced.

- Another document, entitled "The Close" contains similar closing language, including "Well I have great news for you, you called in time! Now when we take on a client we routinely postpone trustee sales, lower monthly payments and even negotiate for a reduction in principal loan amounts. How does all that sound to you? …So are you ready to save your home? OK good, to represent you in this matter the retainer fee will be $5,500."

- In a press release dated April 16, 2009, Mr. Chavarela was quoted as saying that, "America's Law Group is currently in the process of helping almost 2,000 consumers modify their loan payments in order to stay in their homes." (emphasis added)

In fact, ALG started conducting business less than one week before this press release and as of June 1, 2009 claims to have only 408 total clients.

Under Tab 6 is the 2008 Training Manual for Tax Relief ASAP. The scripts for Tax Relief ASAP contain many statements that are similar to those made by RLG and ALG intake officers. Tax Relief ASAP adds a few new statements that appear to contain misrepresentations. An "Approved Script" suggests that Tax Relief ASAP has multiple attorneys, certified public accountants, and enrollment agents. The script reads, "All of our Attorneys, CPA's, Enrolled Agents, and Case Workers are on staff." The script claims that the "owners" of the company have been representing tax payers against the IRS for over 31 years. This is false. Christi and Bryan D'Antonio are the only "owners" the Temporary Receiver has been able to identify.

The Training Manual contains multiple misrepresentations about the number of professional staff available to work for the client and the experience and expertise available in the company.

### Business Volume and Results for the Customers

Under Tab 7 is a report prepared by the Receivership Defendants at the request of the Temporary Receiver that details the results of RLG's and ALG's modification programs.

**EXHIBIT B**

Of the 1,760 consumers who signed up with RLG, 54 files were marked as "disengaged." According to Mr. Rodis, the disengaged classification was used for any file where there was a completed loan modification or a completed file for other reasons such as refunds. Mr. Rodis acknowledged there may have been some refund requests that had been processed, but the disengagement letter had not yet been sent to the client. Mr. Rodis provided the Temporary Receiver database conversation log printouts for these 54 files. In response to the Temporary Receiver's request for clarification about the number of loan modifications completed, Mr. Rodis provided the Temporary Receiver 43 hard copy files showing a disengagement letter had been sent to the consumer. The Temporary Receiver reviewed all of the database printouts and all of the hard copy files for these 97 consumers. All of the information Mr. Rodis provided to the Temporary Receiver indicates that only eight loan modifications had been completed.

The data provided by ALG shows that no loan modifications were completed for any of its 408 consumers.

## Complaints directly from customers and from the BBB

The Temporary Receiver reviewed numerous consumer complaints that were either transmitted electronically by the Better Business Bureau[4] or were received directly from consumers. Generally, the consumers complain about infrequent or sporadic contact from the Receivership Defendants and very little or no progress toward a resolution of a pending foreclosure or mortgage relief. Examples of complaints are under Tab 8.

## The Transition from RLG to ALG

Several reasons have been suggested to the Temporary Receiver for Mr. Rodis' decision to stop accepting new clients through D'Antonio's intake department. During an interview, Mr. Rodis claimed that he decided to sever ties with D'Antonio several months ago after learning of the prior FTC Order against D'Antonio. The Temporary Receiver has discovered a series of e-mail exchanges between Mr. Rodis, Wayne Farris and D'Antonio, which add additional detail to the reasons for the cessation of new business for RLG and the creation of ALG. These documents are attached in Tab 9.

On Friday, February 27, 2009, Wayne Farris, Managing Director of RLG sent an e-mail for distribution to the intake officers directing that they accept every Notice Of Default client at a $1,000 premium and to stop encouraging people to pay their mortgage payments, and let the prospect decide whether to pay their mortgage payment or to pay RLG.

---

[4] D'Antonio receives Better Business Bureau complaints directly into his computer.

**EXHIBIT B**

The next day, Saturday, February 28, 2009, Ron Rodis sent an email to D'Antonio commenting on the e-mail Mr. Farris sent to the intake officers the day before. Mr. Rodis pointed out to D'Antonio that he was concerned about possible violations of the California Rules of Professional Conduct. Mr. Rodis further states that the legal support staff is not in any way caught up with the files. There had been an agreement to stop taking NOD's the third week in January to allow legal support to "catch up" on the files. Mr. Rodis states that, "The long and short of it Bryan is that I feel you and Wayne are attempting to circumvent my authority in many ways for your own benefit." The e-mail goes on to state that Mr. Rodis would not consent to taking on any new NOD cases. Then Mr. Rodis states: "When Juan Carlos steps into my place then you can do whatever you like but that has not happened yet." Mr. Rodis further states "I need you to understand that if my license is on the line, these decagons (sic) cannot be made unilaterally. It is not only bad business practice, it is unethical." Mr. Rodis then demands a retraction e-mail be sent out the following Monday.

The next e-mails clearly show that D'Antonio and Wayne Farris decided to take aggressive steps to hire a new attorney to be the front man in D'Antonio's business enterprise. In an e-mail dated March 1, 2009, Wayne Farris stated that he wondered if "your guy Nick may consent to have files go under his name for a few weeks until Juan Carlos is on board...or perhaps Erik would consider being the attorney of record if it were for a short time. What are your thoughts?"

D'Antonio responded later that same day that he would call "Nick". The transition plan was developed and put into effect.

On April 5, 2009, Mr. Rodis sent another email to D'Antonio outlining some details about a transition from Ron Rodis to Nick Chavarela.

The Temporary Receiver located several pages of handwritten notes in a desk drawer in Mr. Rodis' office (See Tab 10). The notes appear to include some bullet points or talking points that may have been made in preparation for a meeting between Ron Rodis and Bryan D'Antonio. The documents are not dated and may have predated some of the emails discussed above. Some of the statements included in these handwritten notes evidence the disintegrating business relationship between Mr. Rodis and D'Antonio.

- Stop sales immediately for RLG.

- I cannot work for this salary any longer. It has to be doubled for me to continue.

- My percentage is way too small for the huge risk involved (it has to be a minimum of 50%).

- We have to treat each employee very well to watch out for whistle blowers.

**EXHIBIT B**

- Wayne has to go.

- We have to get that other attorney involved now if he wants Bryan can continue to do biz but only w/his name not mine.

- I don't feel like I'm being involved better yet, I think I'm being left out of policy decisions.

- I did not want (illegible name) here as an employee b/c she has years at the DA's office. All her friends are DA's. All she has to do is make one phone call and we bounced several checks. Doesn't matter if it was an honest mistake. Who made that decision to hire her? Wayne.

- Tax Relief is falling apart and I'm afraid same thing will happen to RLG when you put your focus on another project.

- Bryan you are too controlling for me. You want me to be like you and I'm not.

Marketing efforts for RLG were stopped in early April 2009. D'Antonio then utilized Chavarela and ALG was created as his next business enterprise.

Even though employees easily flowed from RLG to ALG, the transition wasn't without some difficulty. In an email sent from a Supervisor, Client Services, Real Estate Division of ALG to the CEO of an outside company, the Supervisor included the "7 things your lender does not want you to know" previously used by RLG, but failed to change the name to ALG in item number seven. The CEO pointed out the inconsistency in his return email (Tab 11).

## Accounting for Financial Results and Consumer Data

According to the Companies' financial information, the gross service revenue of TFG dba Tax Relief ASAP and RLG were approximately $3.2 million and $1.1 million during 2008, respectively. In 2009, the gross service revenue of TFG dba Tax Relief ASAP was approximately $700 thousand (after eliminating inter-company transactions) and service revenue of RLG was approximately $6.2 million. ALG has collected $986,544 from customers since its inception.

On a consolidated basis the three entities have collected a total of $12.1 million from consumers. Refunds have been approximately $1.5 million, or 12% of the total collections. See Tab 12.

**EXHIBIT B**

## Bank Accounts & Cash Frozen

After service on financial institutions the Temporary Receiver learned that funds of the Receivership defendants totaling $1,376,613.99 were frozen. This amount includes reserve balances with credit and debit processors and may be subject to chargebacks. See Tab 13.

## Other Assets

The Receiver traced transfers totaling $900,000 from the Receivership Defendants' or their affiliates' bank accounts to a personal account of D'Antonio at TD Ameritrade. These transfers appear to have been made without explanation or supporting documentation.

On June 11, 2009 the Federal Trade Commission attorneys conducted a deposition of D'Antonio. The Temporary Receiver posed questions to D'Antonio regarding each of the TD Ameritrade transfers. D'Antonio asserted his Fifth Amendment privilege against self-incrimination in response to each of the Temporary Receiver's questions.

Respectfully submitted

/s/

Robb Evans & Associates LLC
Temporary Receiver

**EXHIBIT B**